# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NARENDRANATH CHOWDARY PINNAKA,
SRUTHI KURAPATI, and MINOR CHILD
A.K.P.,

       Plaintiffs,

       v.                          Case No. 24-CV-86

UNITED STATES OF AMERICA, U.S.
DEPARTMENT OF STATE, ANTONY
BLINKEN, U.S. CONSULATE GENERAL
KOLKATA, MELINDA PAVEK, U.S.
DEPARTMENT OF HOMELAND
SECURITY, ALEJANDRO MAYORKAS,
U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, UR MENDOZA JADDOU, U.S.
CUSTOMS AND BORDER PROTECTION,
CBP CHICAGO FIELD OFFICE, PATRICK
SALGADO, CAR26188 NIKOLLA, and JOHN
DOE(S) 1-10,

       Defendants.

---

## DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS COUNTS ONE THROUGH TEN, PLAINTIFFS' MOTION TO STRIKE AND MOTION FOR DEFAULT JUDGMENT, AND DEFENDANTS' MOTION FOR LEAVE TO FILE ANSWER TO COUNTS ELEVEN THROUGH THIRTEEN INSTANTER

---

Indian nationals Narendranath Chowdary Pinnaka and Sruthi Kurapati, along with

their minor child, A.K.P., an American citizen, petition for a writ of mandamus and seek

declaratory and injunctive relief against the United States of America, the U.S. Department

of State ("DOS") and Secretary of State Antony Blinken; U.S. Consulate General Kolkata

and Consul General Melinda Pavek; U.S. Department of Homeland Security ("DHS") and

DHS Secretary Alejandro Mayorkas; U.S. Citizenship and Immigration Services ("USCIS")

and USCIS Director Ur Mendoza Jaddou; U.S. Customs and Border Protection ("CBP")

and CBP Chief Patrick Salgado; and John Doe(s) 1-10 (collectively the "Defendants"). Plaintiffs allege that Defendants improperly denied Pinnaka a visa in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq.* and the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* Plaintiffs further allege that Defendants have unreasonably delayed rendering a decision on Pinnaka's visa application. Plaintiffs also sue under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.* Defendants move to dismiss the immigration claims (Counts One through Ten) pursuant to Fed. R. Civ. P. 12(b)(6) on the grounds that they are barred by the doctrine of consular non-reviewability.

Plaintiffs' FOIA claims are found in Counts Eleven through Thirteen. Defendants answered the FOIA claims within the body of their motion to dismiss brief. (Docket # 13 at 16–20.) Plaintiffs move to strike Defendants' answer to these claims as untimely and move for the entry of default judgment in their favor. (Docket # 17 at 25–30.) In response, Defendants move for leave to file their answer to these counts instanter. (Docket # 21.) Plaintiffs oppose Defendants' motion.

For the reasons further explained below, Defendants' motion to dismiss is granted in part and denied in part. Counts One through Eight and Count Ten are dismissed. Count Nine may go forward. Defendants' motion for leave to file an answer to the FOIA claims (Counts Eleven through Thirteen) instanter is granted. Plaintiffs' motion to strike the answer and for default judgment is denied.

## BACKGROUND

In July 2013, Pinnaka, an Indian national, entered the United States on a student-based F-1 visa to pursue a master's degree in electrical engineering. (Compl. ¶¶ 9, 16,

Docket # 1.) After completing his degree, he began working in the United States. (*Id.* ¶ 16.) In 2016, Pinnaka applied for and was granted an employment-based H-1B visa. (*Id.*) Kurapati, also an Indian national, entered the United States in September 2013 to complete a master's degree in biomedical science as well as a Doctor of Dental Medicine degree. (*Id.* ¶¶ 9, 17.) Kurapati has been working as a dentist since 2020 on an employment-based H1-B visa. (*Id.* ¶ 17.) Pinnaka and Kurapati were married in 2016. (*Id.* ¶ 18.) In 2019, their minor child, A.K.P., was born in the United States. (*Id.* ¶ 20.)

In February 2021, Pinnaka's mother suffered a medical emergency and Pinnaka traveled to India to visit her. (*Id.* ¶ 21.) While in India, Pinnaka was injured and underwent surgery. (*Id.*) On May 11, 2021, Pinnaka returned to the United States, arriving at O'Hare Airport. (*Id.* ¶ 22.) While going through immigration and customs, Pinnaka was taken for questioning and inspection by a CBP officer. (*Id.* ¶ 22.) After questioning and searching through Pinnaka's electronic devices, the CBP officer informed Pinnaka that he was inadmissible because he used a "fake resume" with "fake experience" to obtain employment for his H1-B visa. (*Id.* ¶ 23.) Pinnaka was ordered removed from the United States under INA § 235(b)(1) and banned from re-entering. (*Id.* ¶ 39.) Plaintiffs contend that this inadmissibility finding was unlawful, legally erroneous, violated due process, and was unsupported by the evidence. (*Id.* ¶¶ 34–63.) On May 13, 2021, Pinnaka was returned to India. (*Id.* ¶ 25.)

On September 9, 2021, Plaintiffs submitted to CBP a request to vacate the expedited removal order and to remove the inadmissibility finding against Pinnaka. (*Id.* ¶ 26.) The request was denied on May 19, 2022. (*Id.*) On January 19, 2023, Plaintiff submitted to the USCIS a request to reopen Pinnaka's inadmissibility finding. (*Id.* ¶ 27.) This request was

denied on February 14, 2023. (*Id.*) On August 9, 2023, Plaintiffs submitted to the U.S. Consulate General Kolkata an application to waive the inadmissibility finding and for Pinnaka to be issued an H-4 visa as the spouse of Kurapati, an H1-B visa holder. (*Id.* ¶ 28.) This request remains pending without decision. (*Id.*) On August 14, 2023, Pinnaka visited the U.S. consulate in India to seek re-entry to the United States with an H-4 visa but was refused. (*Id.* ¶ 29.) On October 23, 2023, Plaintiffs submitted to the DHS a request to withdraw the inadmissibility finding, which was denied on November 21, 2023. (*Id.* ¶ 30.)

On December 14, 2023, Pinnaka submitted FOIA requests to the DOS, the USCIS, and the CBP, requesting all materials in connection with Pinnaka's immigration requests and inadmissibility determination. (*Id.* ¶¶ 31–33.) Plaintiffs allege that neither the DOS, the USCIS, nor the CBP have timely responded to the requests. (*Id.*)

On January 22, 2024, Plaintiffs sued Defendants in a thirteen-count complaint. (Docket # 1.) Counts One through Ten relate to the immigration decisions affecting Pinnaka, while Counts Eleven though Thirteen allege violations of FOIA based on the three December 14, 2023 requests stated above. Defendants were served on January 24, 2024. (Docket # 6.) On March 25, 2024, the parties filed a stipulation asking to stay the case to pursue early resolution of the claims. (Docket # 10.) An Order granting the stipulation and staying the case was entered on April 1, 2024. (Docket # 11.) On May 1, 2024, Defendants filed the instant partial motion to dismiss the immigration counts, as well as an answer to the three FOIA counts. (Docket # 12.) Plaintiffs oppose Defendants' motion to dismiss the immigration counts and subsequently moved to strike Defendants' answer to the FOIA counts as untimely and requested default judgment be entered in their favor on the FOIA counts. Defendants moved for leave to file their answer to the FOIA counts instanter.

4

*Defendants' Motion to Dismiss Immigration Counts One through Ten (Docket # 12)*

Defendants move to dismiss Counts One through Ten of Plaintiffs' complaint based on the doctrine of consular nonreviewability.

## STANDARD OF REVIEW

A motion to dismiss based on the doctrine of consular nonreviewability challenges the case's merits, not the federal court's subject matter jurisdiction, thus it is properly brought under Fed. R. Civ. P. 12(b)(6). *See Matushkina v. Nielsen*, 877 F.3d 289, 294 n.2 (7th Cir. 2017). A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.*

(citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

### 1. Legal Framework

By seeking to set aside the admissibility determination, Plaintiffs attack the basis for the denial of Pinnaka's visa applications. However, as the Supreme Court recently stated, the INA "does not authorize judicial review of a consular officer's denial of a visa; thus, as a rule, the federal courts cannot review those decisions. This principle is known as the doctrine of consular nonreviewability." *Dep't of State v. Muñoz*, 144 S. Ct. 1812, 1820 (2024). The doctrine of consular nonreviewability "bars judicial review of visa decisions made by consular officials abroad." *Matushkina,*, 877 F.3d at 294. However, courts will also apply the doctrine to suits where a plaintiff seeks to challenge a visa decision indirectly. *Id.* at 295; *see also Garcia v. Baker*, 765 F. Supp. 426, 428 (N.D. Ill. 1990) (collecting cases and rejecting challenge of visa denial characterized as challenge to State Department's legal opinion allegedly rendered contrary to law because courts "cannot review a consular officer's decision even upon allegations that the consular officer acted on erroneous information, that the INA did not authorize the officer's decisions, that the officer erroneously interpreted and

applied the INA, or that the State Department failed to follow its own regulations" (citations omitted)).

The bar, however, is not absolute. *Matushkina*, 877 F.3d at 294. The *Muñoz* Court explained that "a narrow exception to this bar exists 'when the denial of a visa allegedly burdens the constitutional rights of a U.S. citizen.'" 144 S. Ct. at 1821 (quoting *Trump v. Hawaii*, 585 U.S. 667, 703 (2018)). In that situation, the Court has considered whether the Executive gave a "'facially legitimate and bona fide reason' for denying the visa." *Id.* (quoting *Kerry v. Din*, 576 U.S. 86, 103–104 (2015) ((Kennedy, J., concurring in judgment)). "If so, the inquiry is at an end—the Court has disclaimed the authority to 'look behind the exercise of that discretion,' much less to balance the reason given against the asserted constitutional right." *Id.* (quoting *Din*, 576 U.S. at 104).

Plaintiffs point to several cases in support of their assertion that the denial of Pinnaka's visa applications is judicially reviewable, including *Kleindienst v. Mandel*, 408 U.S. 753 (1972), *Din*, and *Muñoz*. In *Mandel*, the Attorney General refused to waive inadmissibility and grant Ernest Mandel, a self-described "'revolutionary Marxist,'" a temporary visa to attend academic conferences in the United States. 408 U.S. at 756. A group of American professors sued on the ground that the Executive's discretion to grant a waiver was limited by their First Amendment right to hear Mandel speak. *Id.* at 769. The professors did not dispute that "Mandel personally, as an unadmitted and nonresident alien, had no constitutional right of entry to this country as a nonimmigrant or otherwise"; insisting that they were suing not to enforce Mandel's rights, but to enforce their rights as Americans under the First Amendment. *Id.* at 762. The professors insisted that "the First

Amendment claim should prevail, at least where no justification is advanced for denial of a waiver." *Id.* at 769.

In response, the Attorney General argued that "Congress has delegated the waiver decision to the Executive in its sole and unfettered discretion, and any reason or no reason may be given." *Id.* But because "the Attorney General did inform Mandel's counsel of the reason for refusing him a waiver," the Court chose not to resolve this statutory argument. *Id.* The Court stated that so long as the Executive gives a "a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 770. The Court expressly declined, however, to address whether a constitutional challenge would "be available for attacking [an] exercise of discretion for which no justification whatsoever is advanced." *Id.*

In *Din*, Berashk, an Afghan citizen, was married to Din, an American citizen. 576 U.S. at 88. When the government declined to issue Berashk a visa, Din sued. *Id.* The Court reiterated that "because Berashk is an unadmitted and nonresident alien, he has no right of entry into the United States, and no cause of action to press in furtherance of his claim for admission." *Id.* Instead, Din sued, alleging that the denial of her husband's visa application violated *her* constitutional rights, specifically that the government "denied her due process of law when, without adequate explanation of the reason for the visa denial, it deprived her of her constitutional right to live in the United States with her spouse." *Id.* While the *Din* Court considered the question of whether a citizen has a fundamental right to live with her spouse in her country of citizenship, it did not resolve it. Rather, a plurality concluded that a citizen does not have a fundamental right to bring her noncitizen spouse to the United

States, *id.* at 96, while two Justices chose not to reach the issue, explaining that even if the right existed, the statutory citation provided by the Executive qualified as a facially legitimate and bona fide reason, *id.* at 105.

In June of this year, the Supreme Court again addressed the issue raised in *Din*, and this time it "resolv[ed] the open question. Like the *Din* plurality, we hold that a citizen does not have a fundamental liberty interest in her noncitizen spouse being admitted to the country." *Muñoz*, 144 S. Ct. at 1821. In *Muñoz*, Muñoz, an American citizen, argued that the denial of her non-citizen husband, Asencio-Cordero's, visa violated her constitutional rights, thereby enabling judicial review. 144 S. Ct. at 1821. "Specifically, she argues that the State Department violated her fundamental right to live with her spouse in her country of citizenship—and that it did so without affording her the fair procedure guaranteed by the Fifth Amendment." *Id.* The Court reiterated that the Due Process Clause promises more than fair process; it "provides heightened protection against government interference with certain fundamental rights and liberty interest." *Id.* at 1821 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). When a fundamental right is at stake, the government can act only by narrowly tailored means that serve a compelling state interest. *Id.* Because identifying unenumerated rights "carries a serious risk of judicial overreach," *Glucksberg*'s two-step inquiry "disciplines the substantive due process analysis." *Id.* at 1821–22.

The first step is a "careful description of the asserted fundamental liberty interest." *Id.* at 1822 (quoting *Glucksberg*, 521 U.S. at 721). While Muñoz invoked the "fundamental right of marriage," the Court stated that the "State Department did not deny that Muñoz (who is already married) has a fundamental right to marriage." *Id.* Rather, the Court found that Muñoz "claims something distinct: the right to *reside with her noncitizen spouse in the*

*United States.* That involves more than marriage and more than spousal cohabitation—it includes the right to have her noncitizen husband enter (and remain in) the United States." *Id.* (emphasis in original). The Court then attempts to characterize the exact nature of the right Muñoz claims, finding it "difficult to pin down." *Id.* The Court noted that logically, Muñoz's position "suggests an entitlement to bring Asencio-Cordero to the United States— how else could Muñoz enjoy the asserted right to live with her noncitizen husband in her country of citizenship?" *Id.* The Court noted, however, that Muñoz disclaimed that characterization, insisting that she was not advancing a substantive right to immigrate one's spouse. *Id.*

While finding that Muñoz's concession "makes characterizing the asserted right a conceptually harder task," the Court articulated Muñoz's formulation as follows: "a marital right . . . sufficiently important that it cannot be unduly burdened without procedural due process as to an inadmissibility finding that would block her from residing with her spouse in her country of citizenship." *Id.* This assertion, however, is problematic, as the *Din* plurality first noted. Muñoz describes a right "fundamental enough to be implicit in 'liberty'; but, unlike other implied fundamental rights, its deprivation does not trigger strict scrutiny." *Id.* (quoting *Din*, 576 U.S. at 99, "In other words, there are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed.") The *Muñoz* Court noted, however, that such a right would be "in a category of one: a substantive due process right that gets only procedural due process protection." *Id.*

The Court ultimately concluded, however, that it need not determine whether such a category exists because Muñoz could not "clear the second step of *Glucksberg*'s test" of demonstrating that the right to bring a noncitizen spouse to the United States is deeply rooted in this Nation's history and tradition and thus a fundamental right. *Id.* at 1822–23. On the contrary, the Court found that the "through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens" and Muñoz pointed to no subsidiary tradition that curbs the authority in the case of noncitizen spouses. *Id.* at 1823.

The Court further found that to the extent the Ninth Circuit read *Mandel* to hold that citizens have procedural due process rights in the visa proceedings of others, that is incorrect. *Id.* at 1826. The *Muñoz* Court concluded that:

> Whatever else it may stand for, *Mandel* does not hold that a citizen's independent constitutional right (say, a free speech claim) gives that citizen a procedural due process right to a "facially legitimate and bona fide reason" for why someone else's visa was denied. And Muñoz is not constitutionally entitled to one here.

*Id.* at 1827.

2.    *Application to This Case*

As an initial matter, the Supreme Court has articulated on multiple occasions that a non-citizen cannot invoke the "narrow exception" to the doctrine of consular nonreviewability because a non-citizen has no "'constitutional right of entry to this country as a nonimmigrant or otherwise.'" *Muñoz*, 144 S. Ct. at 1821 (quoting *Mandel*, 408 U.S. at 762). Thus, as non-citizens, neither Pinnaka nor Kurapati can invoke the exception to consular nonreviewability. As such, Pinnaka and Kurapati's claims challenging the consular

official's denial of a visa (Counts One through Eight) must be dismissed as barred by consular nonreviewability.

Pinnaka's and Kurpati's minor child, however, is an American citizen. Again, the "narrow exception" to the doctrine of consular nonreviewability exists when the denial of a visa allegedly burdens the constitutional rights of a United States citizen. *Id.* In evaluating the applicability of the exception, I must start with a careful description of the asserted fundamental liberty interest. *Id.* at 1822. As in *Muñoz*, Plaintiffs do not assert that A.K.P. has a substantive right to "immigrate his father" to the United States. (Pl.'s Br. in Opp. at 13.); *see Muñoz*, 144 S. Ct. at 1822 (noting that this "concession is wise, because such a claim would ordinarily trigger strict scrutiny—and it would be remarkable to put the Government to the most demanding test in constitutional law in the field of immigration, an area unsuited to rigorous judicial oversight"). Rather, Plaintiffs argue that as an American citizen, A.K.P. has a right to live in the United States. However, because he is only five-years-old, Plaintiffs argue that this right cannot be exercised without the physical presence of his biological parent. (Docket # 24 at 3.)

In this case, A.K.P. still has the physical presence of a biological parent in the United States, his mother. Even assuming, however, that A.K.P. had no biological parents that could legally reside with him in this country, the Seventh Circuit has found that while the absence of a parent undoubtedly creates hardships, these hardships do not allow an otherwise unqualified non-citizen parent "to append to the children's right to remain in the United States." *Oforji v. Ashcroft*, 354 F.3d 609, 617–18 (7th Cir. 2003). The court explained that a citizen minor child has a right to stay in the United States without his parent, even

though "that would likely require some form of guardianship—not a Hobson's choice, but a choice no mother [or father] wants to make." *Id.* at 617.

Although Plaintiffs do not specifically raise the issue of "constructive" or "de facto" deportation (perhaps because A.K.P. still resides in the United States with his mother), to the extent he asserts this claim, courts have rejected it. In *Schleiffer v. Meyers*, 644 F.2d 656 (7th Cir. 1981), the court found that the constitutional right of a citizen to travel, to exercise a choice of residence, and to leave or stay in the United States as one chooses "is not always absolute in children." *Id.* at 662. The court explains:

> That this undoubted right in adults is not always absolute in children has been adjudicated several times in the context of what has been called de facto deportations, that is, where deportable aliens have sired children born in the United States who are therefore American citizens. Many courts of appeal have concluded that the constitutional rights of such citizen-children are not violated when the deportation of their parents necessitates the children's de facto deportation. In such cases, it has been noted that the child's return to the foreign country "will merely postpone, but not bar, (his or) her residence in the United States if (he or) she should ultimately choose to live here."

*Id.* at 662–63 (internal citation omitted); *see also Coleman v. United States*, 454 F. Supp. 2d 757, 768–69 (N.D. Ill. 2006) ("[B]ecause the pending removal order [of the citizen-minor's mother] does not have any legal effect on [the citizen-minor's] right to remain in the United States, [he] will not suffer an injury to his constitutional rights when that order is executed. . . . This is not to say that [the citizen-minor] will not suffer a hardship; undoubtedly, he will. But the question before the Court is whether that hardship is of constitutional magnitude— under any construction of the alleged facts, it is not. Thus, Plaintiff has not stated a claim upon which relief may be granted.").

Plaintiffs further contend that A.K.P. has a liberty interest in being raised by his father in his country of citizenship; thus, A.K.P. has the right to procedural due process

protections to determine whether his father is inadmissible before depriving him of the underlying right. (Pls.' Br. in Opp. at 13, 18.) But the *Muñoz* Court explicitly found that "*Mandel* does not hold that a citizen's independent constitutional right (say, a free speech claim) gives that citizen a procedural due process right to a 'facially legitimate and bona fide reason' for why someone else's visa was denied." 144 S. Ct. at 1827.

Plaintiffs attempt to distinguish *Muñoz* in two ways. First, they argue that the Court "explicitly confined its holding to, and rejected the exception's applicability for, noncitizen spouses of U.S. citizens." (Docket # 24 at 2.) But the Court made no such "explicit" finding limiting its holding to spousal relationships. Rather, the Court spoke in terms of "a citizen's" independent constitutional right not giving the "citizen" a procedural due process right regarding "someone else's" visa. 144 S. Ct. at 1827. Second, though not entirely clear, it appears that Plaintiffs argue that, like *Mandel*, they raise a violation of a substantive constitutional right (i.e., A.K.P.'s right to live in the United States) rather than a due process violation. (Docket # 24 at 2–3.) But Plaintiffs clearly do raise due process violations (Compl. ¶¶ 78–82, 90–94) and, as previously stated, the denial of Pinnaka's visa does not deprive A.K.P. of his right as a citizen to live in the United States.

Thus, Plaintiffs have not shown that they meet the "narrow exception" to the bar of consular nonreviewability. For Plaintiffs Pinnaka and Kurapati, they cannot meet the exception because they are not U.S. citizens. And for Plaintiff A.K.P., he has not demonstrated that the denial of Pinnaka's visa burdens his constitutional rights. For these reasons, the visa decisions are not reviewable by the Court. Thus, Counts One through Eight of the Complaint are dismissed.

In Counts Nine and Ten, however, Plaintiffs challenge the allegedly still undecided Waiver H-4 Requests on the grounds that Defendants have unreasonably delayed adjudicating the matters. (Compl. ¶¶ 27–28, 30, 49, 101–08.) Because Plaintiffs allege that adjudication is ongoing and thus no final decision has been made, the doctrine of consular nonreviewability is not implicated. *Ebrahimi v. Blinken*, No. 23 C 3867, 2024 WL 2020038, at *7 (N.D. Ill. May 3, 2024). Plaintiffs seek the same relief in both Counts, albeit under different statutory authorities— the APA in Count Nine and a Writ of Mandamus in Count Ten—to compel Defendants to adjudicate Pinnaka's pending petitions without delay.

A mandamus action pursuant to 28 U.S.C. § 1361 grants district courts the power "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." *Ebrahimi,* 2024 WL 2020038, at *8. Mandamus "is a drastic and extraordinary remedy reserved for really extraordinary causes . . . . [O]nly exceptional circumstances amounting to a judicial usurpation of power . . . or a clear abuse of discretion . . . will justify the invocation of this extraordinary remedy." *United States v. Henderson*, 915 F.3d 1127, 1132 (7th Cir. 2019) (internal quotation and citation omitted). Because the mandamus writ is "one of the most potent weapons in the judicial arsenal," it may issue only if three conditions are satisfied. *Id.* First, the petitioner must establish that he has no other adequate remedy. *Id.* at 1132–33. Second, the petitioner must show that his right to the issuance of the writ "is clear and indisputable." *Id.* at 1133. And third, "the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Id.*

In this case, Plaintiffs' ability to seek relief in Count Nine under the APA, which authorizes district courts to "compel agency action unlawfully withheld or unreasonably

delayed," 5 U.S.C. § 706(1), contradicts Plaintiffs' pleading in Count Ten that no other adequate remedy is available. (Compl. ¶ 107.) Thus, I find Counts Nine and Ten duplicative and will dismiss Count Ten. *See Ebrahimi*, 2024 WL 2020038, at *8 ("As other courts have recognized, where relief sought via mandamus is duplicative of that sought under the APA, the court must dismiss the petition for writ of mandamus.").

As to Count Nine, again, the APA gives district courts authority to compel agency action unreasonably delayed. Although not formally endorsed by the Seventh Circuit, a six-factor test created by the D.C. Circuit in *Telecomms. Research & Action Ctr. v. FCC* ("TRAC"), 750 F.2d 70 (D.C. Cir. 1984), usually guides the analysis when "unreasonable delay" is alleged. *Id.* at *9. But Defendants do not move to dismiss on this ground, relying instead on consular nonreviewability. Because consular nonreviewability does not apply to Count Nine, and because the parties have neither briefed nor argued the TRAC test, Plaintiffs are permitted to pursue Count Nine under the APA.

Finally, on August 29, 2024, the CBP Defendants moved to dismiss the immigration complaint against them for lack of subject matter jurisdiction. (Docket # 27.) Plaintiffs responded in opposition, as well as filing a cross-motion for summary judgment as to Counts Six and Seven. (Docket # 29.) Given this decision dismissing Counts One through Eight and given the CPB Defendants do not address the allegations of undue delay for the still pending applications (i.e., Count Nine), it seems that the CBP Defendants' motion is mooted by this decision and order. Defendants are ordered to inform the Court by September 30, 2024 whether they continue to pursue this additional motion to dismiss.

*__Plaintiffs' Cross Motion to Strike Answer to Counts Eleven through Thirteen and for Default Judgment (Docket # 17 at 25–30) and Defendants' Motion for Leave to File Answer Instanter (Docket # 21)__*

As stated above, Defendants filed an Answer to Plaintiffs' three FOIA counts on May 1, 2024. Defendants were served with the Complaint on January 24, 2024. (Docket # 6.) Generally, pursuant to Fed. R. Civ. P. 12(a)(2), the United States, United States agencies, and United States officers and employees sued in their official capacity have 60 days to respond to a complaint. FOIA, however, shortens the government's response time to 30 days. 5 U.S.C. § 552(a)(4)(C) ("Notwithstanding any other provision of law, the defendant shall serve an answer or otherwise plead to any complaint made under this subsection within thirty days after service upon the defendant of the pleading in which such complaint is made, unless the court otherwise directs for good cause shown.").

Within the 60-day deadline for Defendants' response to the immigration causes of action, the parties stipulated to stay the case for thirty days to attempt an early resolution. (Docket # 10.) An Order staying the case was filed on April 1, 2024. (Docket # 11.) On May 1, 2024, Defendants filed their motion to dismiss the immigration counts and an Answer to the FOIA counts. (Docket # 12.)

Plaintiffs argue that Defendants failed to respond to the FOIA counts within the 30-day statutory time frame and neither requested nor received an extension. (Docket # 17 at 25.) Plaintiffs argue that Defendants knowingly failed to timely answer in order to "moot" the FOIA counts by producing certain documents on March 5, 2024. (*Id.* at 26 & n.22.) Plaintiffs further argue that the Answer should also be stricken pursuant to Fed. R. Civ. P. 12(f) because it is facially inadequate, incomplete, and unintelligible. (*Id.*) Plaintiffs also

argue that they are entitled to default judgment on Counts Eleven through Thirteen based on Defendants' failure to properly answer. (*Id.* at 27–28.)

Defendants move for leave to file their Answer instanter pursuant to Fed. R. Civ. P. 6(b)(1)(B). (Docket # 21.) Defendants challenge the validity of Plaintiffs' proof of service, arguing they were actually served on January 30, 2024; argue that Plaintiffs failed to check the box for FOIA on the Civil Cover sheet; and contend that Plaintiffs failed to inform them under Fed. R. Civ. P. 4(a)(1)(D) that the FOIA portion of the Complaint required an answer within 30 days instead of the usual 60 days. (*Id.* at 2–3.) Plaintiffs argue that Defendants have not shown good cause to justify filing a late answer. (Docket # 22 at 6–7.)

Under Fed. R. Civ. P. 6(b)(1)(B), the court may extend the time for a party to file its responsive pleading on motion made after the time has expired "if the party failed to act because of excusable neglect." The Supreme Court elaborated that the inquiry under "excusable neglect" is:

> [A]t bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the [nonmoving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Pioneer Inv. Servs., Co. v. Brunswick Assocs. Ltd. P'ship.*, 507 U.S. 380, 395 (1993). "Although inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect, it is clear that 'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not limited strictly to omissions caused by circumstances beyond the control of the movant." *Id.* at 392.

While both parties hurl accusations of misconduct and deceit, the most likely explanation of what occurred here is exactly what Defendants concede—they "failed to

discern that the FOIA portion of the complaint required an answer within 30 days and not the 60 days in which the Government is normally required to answer a complaint." (Docket # 21 at 3.) This explains why the answer to the FOIA claims came at the same time as the motion to dismiss on the immigration claims. In other words, Defendants assumed, though incorrectly, that their response to the entirety of the Complaint was due in 60 days.

While Defendants should have been aware of the law under FOIA, once again, the inquiry under excusable neglect is at bottom an equitable one. And balancing the equities favors allowing Defendants to file their answer to the FOIA claims. This case is in its early stages, no scheduling order has yet been entered. While Defendants' answer to the FOIA claims was technically due in late February, Plaintiffs did not move for default judgment until May when it responded to Defendants' motion to dismiss the immigration claims. (Docket # 17.) This is likely, at least in part, because the parties were working cooperatively to attempt a resolution of Plaintiffs' claims in March and April. (Docket # 10, Docket # 11.)

There is no indication that Defendants were acting in bad faith when they filed their FOIA answer. Rather, the fact they filed responses to all thirteen causes of action at the same time supports that Defendants were operating under the mistaken belief that the government had 60 days to respond, as it usually does in most circumstances. Finally, courts generally prefer to base their decisions on the merits of the case, rather than on technicalities. *See Foman v. Davis*, 371 U.S. 178, 181 (1962) (stating that it is "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities"). Plaintiffs will still have an opportunity to pursue their FOIA claims, and Defendants can defend against them. For this reason, Defendants' motion for leave to file their Answer to the FOIA counts instanter is granted.

## CONCLUSION

Defendants move to dismiss Counts One through Ten (the immigration counts) on the basis of consular nonreviewability. While I agree that Counts One through Eight are barred by consular nonreviewability and Count Ten fails as a matter of law as duplicative of Count Nine, Plaintiffs will be allowed to proceed with Count Nine at this juncture.

Plaintiffs move to strike Defendants' answer to Counts Eleven through Thirteen as untimely and seek default judgment as to these claims, while Defendants move for leave to file an answer to Counts Eleven through Thirteen instanter. I will not strike Defendants' answer or enter default judgment in Plaintiffs' favor. Rather, Defendants are permitted to file their answer to Counts Eleven through Thirteen instanter.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Defendants' motion to dismiss (Docket # 12) is **GRANTED IN PART AND DENIED IN PART**. Counts One through Eight are dismissed as barred by the doctrine of consular nonreviewability. Count Ten is dismissed as duplicative of Count Nine. Plaintiffs are allowed to proceed on Count Nine of their Complaint.

**IT IS FURTHER ORDERED** that Defendants' motion for leave to file answer instanter (Docket # 21) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants are to inform the Court by **September 30, 2024** whether they continue to pursue the motion to dismiss filed on August 29, 2024 (Docket # 27).

Dated at Milwaukee, Wisconsin this 20th day of September, 2024.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

Case 2:24-cv-00086-NJ     Filed 09/20/24     Page 21 of 21     Document 30